Good afternoon. The first case called on this afternoon's docket is Beckell v. Evers Pharmacy. Counsel, whenever you're ready, you may proceed. Your Honor, opposing counsel, my name is Rhonda Fiss. I'm here on behalf of the appellants. My clients are Allie Beckell, Aliana, we call her Allie, and her mother, Brandi Beckell, and the father, Monty Beckell. That issue in this case is whether a verdict returned by a jury in St. Clair County on September 14th in 2016 was internally inconsistent and inadequate in terms of the damages awarded and whether it was actually a compromised verdict. To briefly touch on the facts pertaining to the issues, first of all, I must say that this case is a little bit unusual because it's not your typical personal injury case where you have someone who claims an injury because something was done to them or not done to them. In this particular case, when Allie was 12 years old, she was given a prescription by the defendant, Dauber Pharmacy, that exceeded the dosage prescribed by the doctor. In fact, Allie was supposed to take 50 milligrams a day of a prescription drug, Dapsone, and instead of 50 milligrams a day, she was given a script for 200 milligrams a day. The reason she was given the Dapsone is because she had a condition that was eventually diagnosed as Bouchette's disease, which is horrific. It causes lesions. There is no cure for it. It will be with her for the rest of her life. Lesions, it can become systemic. The lesions break out on the mouth, in the genitals, in the rectal area, and other parts of the body. When it becomes systemic, as it eventually did with Allie, it can cause internal issues from the lesions, such as bleeding, brain infection. It can cause all kinds of difficulties with a person with this disease. There is a great difficulty and controversy over the treatment for Bouchette's. It seems that nothing completely controls it, but Dapsone, the overdose that she was given of Dapsone, did in fact prove effective in the short period of time that she was able to take it, during the week before the overdose caught up to her and she ended up in the emergency room, it was effective. I want to point out that in defense counsel's brief, it is noted that plaintiff did not cite to the record for any evidence to suggest that the Dapsone had been effective in treating and had actually prevented or lessened her symptoms. In fact, plaintiff's counsel did refer to the record in which Dr. White, the main rheumatologist who treated this condition, said during the brief week that she was able to take this, there was a noted lessening of her symptoms. It had been effective. That is on record 296. So that is, it was undisputed that during that period of time she was able to take the medication, it had proven effective. Plaintiff had the only expert, pharmacological expert, to testify on this issue. He said that in terms of treatment, although Colchicine was recommended as the first line of treatment, that Dapsone had proven to be effective in many cases. And in fact, had less, much less severe side effects as many of the other prescriptions that this plaintiff could be given. In fact, the Colchicine that is the first line of defense was so toxic, is so toxic, that during the period of time that after her overdose, Aliana had to take the Colchicine, she developed some of those symptoms of toxicity, such as bleeding, difficulty, gastrointestinal difficulties with eating, all of those types of things. So this happened when she was 12 years old. And by 2016 May, the Colchicine was not only ineffective in controlling her symptoms, it had developed into this toxic thing where she was having so many side effects from it, that she had to be placed on alternative drugs. And the drugs that they went through, Dr. White went through prescribing for her included human carcinogens, she went through rounds of Imurin, and eventually, right before time of trial, she had ended up prescribed Humira. Humira is a human carcinogen. It is, it can cause, it's an immunosuppressant, so it can lead to all types of difficult side effects, including systemic infections that can be fatal. There is nothing good about Humira other than it suppresses the immune system to the point where these lesions can get some relief. At trial, the evidence was undisputed as to the toxicity of these alternate drugs. Now, when I say this is an unusual case, it is unusual for this reason. Plaintiff's position, the reason that Aliana should have been awarded damages is because the ability to take Daxone with relatively simple and few side effects was foreclosed to her by this overdose. And it cannot be argued otherwise. Why? Because in the medical records from Washington University, it is listed as an allergen, an allergen. It is in bold print. It is throughout her record. And Dr. White talks about it over and over. He comments that, to the effect, if it gets bad enough, I may consider prescribing Daxone to her again. But in fact, instead of that, he prescribed Humira, a human carcinogen, rather than take the risk of prescribing Daxone to her again. No doctor that I'm aware of or that common sense would tell you is aware of that a patient may or is likely to have an allergic reaction that can send them back to the emergency room with possible fatal results is going to prescribe what's defined and known as an allergen in the record. So Daxone was foreclosed to her after her overdose and after she developed methamoglobinemia. That's quite a word, and it should be noted. Because when you develop methamoglobinemia in the amounts to which this overdose developed in Aliana, it can be deadly. It required hospitalization for her. It required treatment. It required blood gasses. The poor girl was on the softball field when the symptoms manifested. She couldn't breathe. She turned blue. If her parents had not been in the medical profession, we don't know what would have happened. They noted her symptoms and immediately sought help and got her to the hospital. But the bottom line here and the damages that we see are, in fact, they were admitted to a degree by defendants. Hey, we did overdose this child. But what we deny is that she should have gotten any future damages. And although the evidence was absolutely undisputed, it was not the case. It was undisputed that the Daxone would likely and had proven to control her symptoms and that nobody has prescribed the Daxone, even though it could be prescribed, but nobody has because it's an allergen to her. The jury, for whatever reason, did not award Ollie future damages. The future damages would have been for cost of medical, this is where the jury gave her a zero, for cost of medical in the future. Now, Daxone was relatively inexpensive, I'm assuming it still is, I don't know. At the time of trial, in comparison to Humira, it was a drop in the bucket. The Humira prescribed for Aliana right before trial cost to the tune of $4,000 a month. Aliana was going to have to take two injections, an injection biweekly, and the cost at time of trial was $4,000 a month. This was attested to by the pharmacological expert. But Daxone was relatively inexpensive. There was no evidence, no evidence whatsoever that Daxone, but for the overdose and the resultant problems she had from the overdose, that Daxone could control her symptoms. She could not and would not have been available as a prescription to control her symptoms. Without the Daxone, Aliana went through virtual health. She developed rectal bleeding. She developed lesions on her genitals, on her rectum, in her mouth. They continued to get worse and at the time of trial had not been under control with anything to a degree. In fact, the Humira was a relatively new prescription that they had come up with to try to control them. The issues before the court are, number one, whether the jury, the award of future damages for medical bills was inadequate. I guess our position is that's an understatement because defendants offered nothing to contradict the evidence that Daxone likely would have been effective. The defendants offered nothing to contradict that Dr. Vogel, the resident who treated Aliana, regularly said, I won't ever give her Daxone again. That the pharmacological expert said, I won't ever, nobody in their right mind would ever make this child take this medicine again. And Aliana herself, how do you get past the fact that a child of 12 goes through this experience and then is expected to die? Mitigate her damages later in life by taking Daxone, a drug that caused her symptoms that for all intents and purposes she thought she was going to die. And what do you do? Hand her a pill and say, hey, we don't know what's going to happen here, but take this, it might make you feel better. No, and the main reason she won't ever take that drug again is because no physician is going to prescribe it to her with those notations in the record. Should the jury have given her damages for foreclosing the opportunity to treat with Daxone that had proven effective by her own rheumatologist's testimony and his evidence deposition? Yes, they should have. Why didn't they? Because they were confused. I don't think they knew what to do. And defense counsel points out that it was plaintiffs that offered that instruction and the court took it. I beg to differ. That is absolutely not what happened. If I may. And which instruction are you talking about now? I'm talking about the burden of proof instruction, Your Honor. And if I may, and I'm reading from the transcript, page 49, because we went through a long time of haggling over this instruction, and the reason was initially I wanted the word admitted in the instruction, even though defendants were admitting negligence and that their negligence caused the initial injury and hospitalization. They would not agree to include that language in the instruction as to any future, but anyway, that was the haggling. And you're talking about A18, the common record 392? Yes. Okay. And at the instructions conference, when we got down to the end of it, I said, so I said, after we put the language in that the parties agree, that plaintiff does not have to prove damages, and I think you're aware of what that says. And my comment was, then you would start first with the first proposition all the way down, just like a normal, and the court interrupted and said, first, that the plaintiff was injured, second, that the negligence of defendant. Okay. And Mr. Burke said, you type it up, Rhonda. I said, I will. There was no objection at that point. Absolutely none. So I'm confused. So was this an instruction that you tendered? I tendered an instruction, but if you look at the record, it was haggled over for a long time. And frankly, because But that doesn't answer the question. I'm sorry? Well, whose instruction was it? The one finally given, I think. The one finally given was an agreed instruction. Mr. Burke acquiesced, because once we talked about what language should be in there, there is no question that Mr. Burke acquiesced. And I was told to type it up. So let's assume that then. Where are you when you're now invoking error in an instruction that you agreed to? Isn't there a long line of cases, including Supreme Court cases? There's a long line of cases. There is. I think the verdict is inconsistent. My focus on the appeal is not that the instruction was improper, but I think the verdict is inconsistent, even if you assume the instruction is proper. If you assume the instruction is improper, I don't know how you reconcile the jury's verdict awarding zero in future damages with the jury's verdict awarding zero in future damages. With their award of what appears to be future payment suffering, future loss of a normal life, and then you get a zero in the blank for future medical bills. Well, let me stop you there. One of the problems I have with the verdict form in relationship to the instruction is that the instruction says we agree to the verdict. We agree, which to me is an admission, for this period of time, July 23 to July 31. And then it goes on to say for any damages sustained after that, they have to prove the following. And then the verdict form doesn't break out past versus future.  So how do we know what the jury gave for the past as opposed to the future in light of this admission of liability? I mean, it seems as though it's tough to figure it out. And then when you look at under the Family Expense Act, you've got $9,971.69, which is the amount admitted. And when it comes to medical bills for the plaintiff, again, it says medical care treatment and services received. That's passed. And you get a zero. But then you've got a verdict form that says 9,700. I don't understand how these verdict forms were rendered in light of this instruction. Were these verdict forms agreed to? They were, again, hassled over, haggled over for a long time and ultimately agreed to. But I don't think it's ---- What does a court do when you have an agreed to instruction and agreed to verdict forms that at least appear? The verdict form doesn't appear to correctly recite what the instruction says. I know. And I agree that's the problem here. And I will tell you that there were things about the verdict form that I didn't like, what Mr. Burke was proposing, and things about what I proposed that Mr. Burke didn't like. I thought that the word defendants have admitted that they were negligent and therefore blah, blah, blah, as to certain things. I think Mr. Burke in his closing argument says I think they're entitled to the damages for the methadone. Methamphetamine. I mean, it says in his closing that they're entitled to that. So I'm curious why the verdict form didn't set out the past damages related to the dates. Sorry, I have a bad wing today. Between July 23, 2012 to July 31. Why wasn't that on the verdict form and then the future and then that and then the future if you've got an admission of liability? I agree. I think it should have been done that way in retrospect. And I think that's where the confusion came in, and I think that could explain why it appears to be a compromised verdict. I don't know that it explains why the jury ignored the evidence as to future medical damages. I can't tell from the verdict whether they intended those numbers that they did award for past or future. Because they were told in the one instruction that they didn't have to prove any damages for the past medical treatment. So I must assume that was intended for future medical when they gave those numbers, those damages in the verdict form. If that were true, I don't understand how they could leave a zero in the future medical bill section. But I will tell you, based on the evidence they heard at trial that was undisputed, I think the jury's verdict was inaccurate. It just simply ignored the evidence that this child had effective treatment with the Dapsone, that this child, according to the medical records, and according to the only pharmacological expert, will never take Dapsone again because no physician in his right mind, his or her right mind, would prescribe it to her. So she was foreclosed from that, and as a result, she will pay $4,000 plus a month, as the situation stood at time of trial, for Humira or a similar toxic substance to address the horrific systemic injury she has now because the Dapsone was prescribed. And because the Dapsone wasn't available to her. I mean, I don't know. Thank you. Thank you. May it please the Court, Counsel, A23, the appendix to our brief, is the verdict form A23, and that was refused. That was refused, and it specifically, and I tendered it because I had admitted that my client misfilled that prescription. I had admitted that that misfill, that overdose, caused methemoglobinemia. The only reason we went to trial was to determine what the episode of methemoglobinemia was worth with respect to medical bills and pain and suffering, and then whether we were responsible for anything that happened to her after that, for the progression of her disease. So wait a minute. You admitted that you gave the wrong drug and that you were responsible for the methemoglobinemia. Yes, ma'am. And we admitted, we gave the right drug, just the wrong dose. Right, right, right. But you disputed the $27,800.49. Absolutely. Absolutely. Because I think... And you disputed the hospital bill as well, the $9,771? No, ma'am. If you look at my closing argument, I told them to give that amount, and that's... You told them to give the $9,000, but you told them you disputed liability for the remaining bills. Yes, ma'am. And that would have been the bills after July 31? Yes, ma'am. And I think that right there proves the jury got it.  We owe for the methemoglobinemia, but we don't owe for anything else. Did you have an expert talk about the impact of the methemoglobinemia on the future of this child in relationship to the Dapsone? Yes, ma'am. It's undisputed. Once it was treated and resolved, it's no longer a problem. Dr. White testified to that. I believe their pharmacy expert even testified to that. I can't recall if Dr. Bayless testified to that. That wasn't even an argument that they were making, that methemoglobinemia somehow affects the shots. No, no, my question was about the... Can she get Dapsone again? According to Dr. Bayless, Dr. White, the two treaters, I mean, they both testified, it's in the record, if they thought it was more effective, they would get it to her. And even their pharmacy expert said it's not an allergy. Dr. Bayless, the dermatologist, said it's not an allergy, it was an overdose. They would give it to her. I mean, I can understand that, but the evidence was not even that it's the most effective way to treat this. Because at the time, they thought she had a different disease. Dr. Bayless, our dermatologist, thought she had aphosis, which is like canker sores. You get them in your mouth, she gets them in her genitals around her perianal area. But when that wasn't really resolving, she made the referral to Dr. White, the pediatric dermatologist, and she testified. She made that referral because they use better and different medications. And Dr. White testified his first-line treatment for Bichette's, which was the diagnosis, is Colchicine. My colleague wants to say that the Dapsone was effective because when she took it, it eliminated her ulcers. That's just contrary to the evidence. Their own expert admitted at trial, when she goes into the emergency room, after having been on high-dose Dapsone for six days, she still has three ulcers. She has oral ulcers and genital ulcers. So the Dapsone hadn't resolved those. It's undisputed that the Dapsone, even their expert says on the literature they refer to, if you're on that, you're still going to have flares of this disease where you're going to have to take prednisone. It's undisputed. Ms. Fitz told you. This is a disease that starts out with oral, genital ulcers and it becomes systemic over time where it starts affecting other systems. That doesn't have anything to do with whether she's getting Colchicine or Dapsone. It's just the disease. So we were responsible for the methemoglobinemia. And Ms. Fitz prepared this exhibit to go to the jury that's 821 that lists the bills for the treatment for the methemoglobinemia. I told the jury, give that amount. We owe that amount. We owe for the methemoglobinemia. We own it. But we don't owe for anything else. The next exhibit, 822, is the additional medical bills beyond the methemoglobinemia that were requested. They didn't give it. And they didn't give it because all they found, based on the overwhelming evidence from their witnesses, their treating doctors, their expert, I didn't put a witness on the stand. Their witnesses established Dapsone was no evidence. Dapsone was more effective. The literature their expert relied on, some of it says it's not effective. Other studies, they only had a population base of 20, which was too small of a group to tell. And others don't even list it as a first-line treatment. It lists Colchicine as the first-line treatment. Now, my colleague wants to compare Humira to Dapsone. Well, that's at a time when that's now in her GI tract. They had literature at trial that says when it's in the GI tract, you don't give Dapsone, you don't give Colchicine. Because once it's in the GI tract, it's not going to be effective. You give something like Humira, which is what the doctors were doing. So they're following her symptoms. This very nice young lady was on Colchicine for almost three and a half years and reporting no side effects, pretty good control, with an occasional flare, a breakout of the ulcer, at which time they would add in Prednisone. In May of 2016, when she's no longer 12, she's now 16, her body's developing, it becomes systemic. And that's where they're at now. It's an unfortunate disease. But remember, the issue we tried, we didn't try the case saying we're not liable. We didn't try the case saying we're negligent. We're trying the case, we owe for the methemoglobinemia. We misfilled it. We owe for that. But we're disputing we owe for anything else. The jury heard that in my opening statement. They heard that throughout the trial. In my closing argument, I told them to give the medical bills for the methemoglobinemia. I told them the dollar ranges I thought that the pain and suffering was worth. The fact that the court gives a jury instruction on Ms. Fisk's request, and she objected to my tendered instruction, that doesn't separate those out. That doesn't mean they meant to give her future pain and suffering. It meant that's the only line they had available to write a number down on. But I think you look at A22 and A21. They gave her the medical bills for the methemoglobinemia. They're not giving medical bills for anything beyond that. I think the jury absolutely got it. To say they were confused by the instruction, that wasn't instructions or verdict forms I tendered. I objected to the burden of proof instruction, which said they didn't have to prove damages from July 23 to 31. Not that I was arguing against it. I just didn't think it was you still can give the regular burden of proof instruction. I had already admitted we were on the hook for that. So to say those instructions that they tendered entitles them to a new trial in the face of the case law you're all familiar with. Is this not the case? I don't think the jury was confused at all. I think they got this case absolutely clearly. They admitted that we caused the methemoglobinemia. But based on the evidence they heard from their witnesses, Dr. Bayless, Dr. White, Dr. O'Donnell, the pharmacist, he even said, it's in the record. I asked him, are you telling this jury that Dapsone would have been more effective? He goes, no, I'm not, I'm not. And he acknowledged the literature they brought into court, they brought it in. It says Colchicine is the first line treatment. So there's no confusion. This isn't a situation where it's a compromised verdict. But the case she cites says there was a verdict for one party, but they didn't award damages. So they kind of compromised on liability and damages. That's not what we have here. I think the jury just absolutely got this case. And I think it's crystal clear, despite, I had problems with the verdict form because they didn't separate that out. But they wrote down those numbers, and the only place they were given to write those numbers. That's not the defendant's doing, that instruction. I tendered one that would separate it. It was objected to and it was refused by the court. So my position is this verdict should stand. The jury got the case. The verdict is based solidly on the evidence. To say it was undisputed at trial, that Dapsone was more effective, that's contrary to the expert testimony at trial from every doctor that testified. So unless you folks have any more questions, that's all I have. Was there any evidence as to the side effect of regular uses of prednisone? There was. It could cause weight gain. It can cause weight gain. But again, Judge, she was not on prednisone a lot from 2012. Periodic. Yes, sir. But from 2012 to May of 2016, I don't know that it was three times a year on that.  Thank you, counsel. Okay. Thank you. Counsel? First of all, to address the representation that our pharmacological expert agreed that Dapsone would have been ineffective, I'd ask the court to revisit pages 6 through 8 of my brief. On page 8, I quote our expert's testimony at trial. Quote, treatment with Dapsone could have significantly improved Aliana's systemic manifestations of Bichette's, which she could have tolerated better than other drugs that had been administered to her. The doctors noted that her lesions cleared up for six days that she received it. That's on page 79 of the record. It's been represented to you that we offered no evidence to that and that our own expert disputed that Dapsone would not have been effective. That is simply not true. As you've heard, we had testimony not only that, we had Dr. White saying undisputed that during the time she took the Dapsone, the symptoms were cleared up. He said, oh, she had three lesions. That's in the record. She had three as opposed to the 25 or 30 that she had before the Dapsone was given to her. Dapsone is no longer an option. I have pointed you to exhibit. Apparently that was disputed, however. I'm sorry? Apparently that was disputed, that it's no longer an option. It isn't disputed. He said it's not considered an allergy. Exhibit A11, the court's record A11. That's her medical record from Wash U. It is listed as an allergen throughout. Dr. Tiffany Vogel, whose input into the records says specifically, I had told mom we would never prescribe Dapsone for her again. That's a rheumatology resident there. And the fact is, rather than chance it, Dr. White prescribed her Humira and a plethora of other drugs that are toxic and carcinogen in nature. So if, in fact, he thought she could take Dapsone with very little risk, and he knew that it had been effective, it doesn't make sense that he wouldn't utilize it. So our position is this. First of all, the jury verdict was grossly inadequate as to future damages. Secondly, the verdict form is inconsistent with the instruction, and the inconsistency does not match the evidence. There should have been an award. There must have been some confusion. Either that or there was a compromise, because there was no evidence. Your Honor, I believe you asked counsel whether they had an expert, defense had an expert, to dispute the efficacy of Dapsone. And the response was they had one, but they withdrew him and didn't present him at the last minute. And they didn't present him. Let's just say that he had the same opinion, that Dapsone could have been an effective treatment for this. Well, the question was asked... We've got the record. We've got the arguments of counsel. We'll make a conclusion on that. Thank you. And so without belaboring this any longer, I'd ask that the court consider that there is a glaring, glaring issue with this verdict that was rendered in light of the evidence that was heard and the verdict that was given as to future medicals. There was nothing to dispute that she would incur them, and she met her burden of proof as to why she would incur them, because Dapsone was no longer available to her. Thank you.